Ray D. Hacke, OSB #173647
PACIFIC JUSTICE INSTITUTE
1850 45th Ave. NE, Suite 33
Salem, OR 97305
(503) 917-4409 Phone
(916) 857-6902   Facsimile

Attorneys for Plaintiff
RYAN CLARK

## UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| RYAN DOUGLAS CLARK, An Individual, | Case No.: |
| Plaintiff, | **VERIFIED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS [42 U.S.C. § 1983; ORS 30.260-30.300], VIOLATION OF STATE EMPLOYMENT LAW [ORS 659A.030(1)(a) and (g)], AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** |
| v. | |
| GRANTS PASS SCHOOL DISTRICT NO. 7, A Public Body; KIRK KOLB, An Individual, In His Capacity As Superintendent of Grants Pass School District No. 7; BARRET SALE, An Individual, In His Capacity As Principal of South Middle School; and DOES 1 THROUGH 50, Inclusive, | |
| Defendants. | **JURY TRIAL REQUESTED** |

Plaintiff RYAN DOUGLAS CLARK ("Plaintiff") hereby alleges as follows:

## **PARTIES**

1.      Plaintiff is, and at all times herein was, a resident of the County of Josephine and a teacher employed by Defendant GRANTS PASS SCHOOL DISTRICT NO. 7 ("GPSD").

2.      Defendant GPSD is, and at all times herein was, a public school district and a public body as defined in ORS §§ 30.260(4)(b) and 174.109.  GPSD furthermore is, and at all times herein was, a "body corporate" that may sue and be sued under ORS 332.072, may buy and sell property, and satisfies any damages obligations owed to tort claimants from its own liability insurance, not from state funds.  *See* Attached **Exhibit "A"** [a copy of a notice from GPSD's insurer, the Special Districts Association of Oregon].

3.      Defendant KIRK KOLB ("KOLB") is, and at all times herein was, a resident of Josephine County and the Superintendent of Defendant GPSD.

4.      Defendant BARRET SALE ("SALE," and collectively with GPSD and KOLB "Defendants") is, and at all times herein was, a resident of Josephine County and the principal at South Middle School ("SMS"), a public school governed and operated by Defendant GPSD.

5.      The true names and capacities of Defendants DOES 1 THROUGH 50 (collectively the "DOES"), inclusive, are unknown to Plaintiff, who thus sues said Defendants under such fictitious names.  Each Defendant designated herein as one of the DOES is legally responsible for the events and happenings herein referred to and proximately caused injuries and damages to Plaintiff thereby, as herein alleged.  Plaintiff will seek leave of this Court to amend this Complaint to show the DOES' names and capacities once they have been ascertained.

## **JURISDICTION**

6.      Plaintiff refers to and hereby incorporates the allegations of Paragraphs 1 through 5 into this Paragraph as if fully set forth herein.

7.      This Court has jurisdiction over Defendants pursuant to 28 U.S.C. § 1331 because Plaintiff's action arises under the Constitution and laws of the United States.

## VENUE

8.    Plaintiff refers to and hereby incorporates the allegations of Paragraphs 1 through 7 into this Paragraph as if fully set forth herein.

9.    Venue is proper in the Court's Medford Division because the incidents giving rise to this Complaint occurred in Josephine County and all Defendants are located in, employed in, and/or residents of Josephine County.

## GENERAL ALLEGATIONS

10.    Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 9 into this Paragraph as if fully set forth herein.

11.    Plaintiff is employed as a teacher at SMS, a public school governed and operated by Defendant GPSD.

12.    Plaintiff is mindful of his professional responsibilities concerning equity, diversity, and inclusion.  He has made concerted efforts to comply with SMS, District, and Oregon Department of Education ("ODE") guidelines, both in and outside of the classroom, with regard to maintaining a safe, respectful learning environment for his students, consistently treating them – as well as fellow teachers, administrators, and staff at SMS – with respect and dignity.

13.    Plaintiff is in good standing with Oregon's Teacher Standards & Practices Commission ("TSPC").

14.    Plaintiff is also a devout Christian who sincerely, and firmly, believes the Bible calls him to "go and make disciples of all nations" (Matthew 28:19). Plaintiff thus spends many of his off hours preaching gospel messages at various locations or events throughout the City of Grants Pass.

15.    A necessary aspect of "making disciples," in Plaintiff's view, is preaching the gospel of Jesus Christ publicly to people he may not otherwise see at church or other religious gatherings (Romans 10:14).

16. Also part of making disciples, in Plaintiff's view, is making others aware of what the Bible declares to be sin and warning people of sin's eternal consequences (Ezekiel 33:8) – namely, going to hell – so people at least have the opportunity to repent of their sins (Acts 2:38; John 3:18) and come to saving faith in Christ (2 Corinthians 7:10).

17. Some of Plaintiff's gospel messages have reflected traditional biblical views on marriage, gender, and sexuality – specifically, that marriage is exclusively between a man and a woman, that God created all people male or female, and that any sexual conduct outside marriage, regardless of whether it is between two persons of opposite sexes or the same sex, constitutes sin.

18. At the same time, Plaintiff believes that the Bible condemns hatred and prejudice.  Plaintiff's messages have reflected this as well.

19. Plaintiff also regularly associates with groups of like-minded people for purposes of advancing the gospel.  These groups have been inaccurately maligned by some as being hatemongers or accused of using "fear tactics," harassment, and intimidation due to the controversial nature of their message.

20. When the groups that Plaintiff associates with gather, some members take turns preaching while others pass out tracts or hold signs promoting their message.  At least some of these tracts and signs affirm the biblical view of marriage, gender, and sexuality while, at the same time, condemning hatred and prejudice.  However, it is the portions of the signs and tracts concerning marriage, gender, and sexuality that many LGBT+ persons and their supporters focus on.

21. While the groups' message is, to some degree, provocative – the groups aim to stir non-believers' consciences and thereby spark conversations that lead to making disciples – the groups' members generally try to be peaceful and non-confrontational: They refrain from using insults or abusive language and

select their words carefully to avoid alienating potential listeners to the extent they can without watering down their message.

22.     Like the members of the groups he associates with, Plaintiff tries to be peaceful and non-confrontational when he preaches, prefacing his comments with statements like, "If you have engaged in …"  This way, Plaintiff avoids making insinuations about, or leveling accusations toward, people he may be encountering for the first time that day.

23.     If someone chooses not to engage in discussion with Plaintiff, Plaintiff lets that person walk on by without any further issue.

24.     Given that Grants Pass is a relatively small city (pop. 34,533), there is a substantial likelihood that some of his fellow SMS teachers or students will see him preaching his gospel messages around town.  Some already have.

25.     When preaching around Grants Pass, Plaintiff does not wear any clothing or carry any gear bearing SMS' name, colors, and insignia, nor does he identify himself as a teacher employed by Defendant GPSD in any way, as his occupation is irrelevant to the message he wishes to preach.  If Plaintiff's clothing or gear bears any symbols or messages at all, they are symbols or messages that relate to the gospel message he is preaching that day.

26.     Plaintiff's evangelism activities have led certain colleagues at SMS to file complaints against him: Two of his fellow SMS teachers claim they do not feel safe being in a room with him, or even working in the same building, because they are emotionally triggered by the views he has expressed.

27.     Plaintiff has consistently treated colleagues and students with the utmost respect and dignity, regardless of whether they share his beliefs.

28.     In response to complaints from some of Plaintiff's fellow teachers at SMS, Defendant SALE, SMS' principal, has investigated Plaintiff's activities

multiple times and found that Plaintiff has done nothing to violate SMS, GPSD, or ODE policies.  *See* Attached **Exhibit "B"** [a preliminary investigation report summarizing SALE's findings concerning Plaintiff's evangelism activities].

29.    SALE has also acknowledged that Plaintiff has not forfeited his freedoms of religion, speech, association, and assembly – which are protected under both the U.S. and Oregon constitutions – by accepting employment as a public-school teacher.  *See* Ex. "A."

30.    Defendant GPSD submitted the above-referenced preliminary investigation report concerning Plaintiff to the TPSC.  Like GPSD, the TSPC could not find sufficient cause to charge Plainntiff with professional misconduct.  *See* Attached **Exhibit "C"** [a copy of a letter from the TSPC concerning Plaintiff's actions].  Accordingly, the TSPC has taken no action against Plaintiff.  *Id.*

31.    Despite absolving Plaintiff of wrongdoing and acknowledging Plaintiff's constitutionally protected rights, Defendant SALE expressly prohibited Plaintiff from – or at least sternly warned him against – doing the following:

   a.  Posting on social media "hateful messages about individuals protected by District policies on discrimination";

   b.  Appearing at "any youth gathering within the school district where students are likely to see [Plaintiff] associating with groups expressing" biblical opinions on marriage, gender, and sexuality;

   c.  Harassing students and/or parents inside or outside of school, or otherwise engaging in "fear tactics and intimidation";

   d.  Associating with groups that "may be seen as using fear tactics … to harass and intimidate people"; and

   e.  Handing out pamphlets or tracts concerning the LGBTQ+ to students and/or parents in or outside of school.

32.    Defendant GPSD gave Plaintiff the option to appeal Defendant SALE's findings.  Plaintiff exercised this option to obtain clarification as to what he could and could not do when engaging in evangelism.

33.    In response to Plaintiff's request for clarification, Defendant KOLB, acting in his capacity as Defendant GPSD's superintendent, issued to Mr. Clark a letter outlining what Mr. Clark is free to do or not do, and what he is required to do by law.  *See* Attached **Exhibit "D"** [a copy of said letter].

34.    In the letter, KOLB purported to dictate the following:

   a.  What Plaintiff can and cannot say: For instance, Plaintiff is not free to say, "'You'll burn in hell if you do/don't' (fill in the blank)," as GPSD has deemed such speech hateful;

   b.  How Plaintiff can preach his message: He cannot "attempt to persuade by invoking feelings of insecurity and fear," even though, as the Bible says, "Fear of the Lord is the beginning of wisdom" [Psalms 111:10; Proverbs 9:10].  GPSD has also prohibited Plaintiff from engaging in "harassment" using a definition that the Oregon Supreme Court has deemed unconstitutional [*see State v. Johnson*, 345 Or. 190 (2008)] and told Plaintiff he cannot hold signs or pass out pamphlets concerning the LGBTQ+ community;

   c.  Where Plaintiff can preach his message: He cannot participate "in any gatherings at youth events, whether school-related or not, within" GPSD's geographic boundaries –  he cannot even teach a Sunday school class or lead a youth group meeting at his church;

   d.  Whom Plaintiff can preach his message to – this includes youths at the gatherings mentioned above and parents who may possibly receive a pamphlet or tract from Plaintiff; and

e. Whom Plaintiff can associate with for expressive purposes: GPSD has told Plaintiff that he cannot be involved with "any associated, organized gathering of people that may be perceived to be harassing or intimidating," even if that perception is inaccurate.

35.     Despite finding that Plaintiff engaged in no wrongdoing, Defendants have repeatedly threatened Plaintiff with discipline, including reassignment and dismissal, if he causes a "substantial disruption" at SMS.  *See* Exs. "B" and "D."

36.     Defendants' actions have caused Plaintiff – the sole breadwinner of a family of six – to suffer extreme emotional distress: He is fearful that he will lose his job unless he ceases his evangelism activities or waters down his message – neither of which he can do as a matter of conscience.  He is also depressed due to the mistreatment he has suffered at the hands of Defendants – who, on one hand, have repeatedly asserted an interest in promoting a safe, inclusive environment for GPSD teachers and students, while on the other, have made abundantly clear that they are hostile to Plaintiff's Christian beliefs and his expression of them.

37.     Plaintiff, acting by and through counsel, attempted to resolve this matter informally, alerting Defendants to the unconstitutional nature of their actions and demanding that Defendants rescind, in writing, both their unlawful directives to Plaintiff and its unlawful threats of adverse employment actions.  *See* Attached **Exhibit "E"** [a copy of a letter to Defendants SALE and KOLB dated March 26, 2021].  Defendants did neither.

38.     Plaintiff, acting by and through counsel, furthermore alerted Defendants of his intent to sue them via a letter submitted to Defendants on May 6, 2021.  A copy of that letter, and confirmation of receipt by Defendant KOLB, is attached hereto as **Exhibit "F."**

39.    Plaintiff has sought and obtained a right-to-sue letter from the Equal Opportunity Employment Commission's Seattle field office.  A copy of that letter is attached hereto as **Exhibit "G."**

**FIRST CAUSE OF ACTION:**
**DEPRIVATION OF RELIGIOUS FREEDOM (FEDERAL)**
**[U.S. Const. amend. I; 42 U.S.C. § 1983]**
**Against All Defendants**

40.    Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 39 into this Paragraph as if fully set forth herein.

41.    Under 42 U.S.C. § 1983, anyone who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

42.    Under 42 U.S.C. § 1983, public bodies, like Defendant GPSD, and their officers, employees and agents acting within the scope of their employment, such as Defendants SALE and KOLB, can be held liable for civil rights violations that arise out of a governmental or proprietary function.

43.    The U.S. Constitution's First Amendment, made applicable to states through the Fourteenth Amendment, prohibits public bodies from infringing on individuals' freedom of religion.  The Fourteenth Amendment prohibits public bodies from "depriv[ing] any person of life, *liberty*, or property without due process of law."

44.    Acting under color of state law, Defendants have violated Plaintiff's constitutionally protected freedom of religion by attempting to dictate the terms on which Plaintiff may preach the gospel and threatening him with reassignment or dismissal for failure to comply.  Defendants have furthermore passed judgment

upon Plaintiff's religious beliefs, deeming them "hateful," essentially labeling Plaintiff a fearmonger for expressing them, and thereby violating the constitutional requirement that government remain neutral toward religion.

45.    Defendants' actions neither serve a compelling government interest nor are narrowly tailored to serve such an interest.

## SECOND CAUSE OF ACTION:
## <u>DEPRIVATION OF FREEDOM OF RELIGION (STATE)</u>
### [Or. Const. art. I, §§ ORS 30.260-30.300]
### Against All Defendants

46.    Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 45 into this Paragraph as if fully set forth herein.

47.    Under ORS 30.265(1), public bodies, like Defendant GPSD, and their officers, employees and agents acting within the scope of their employment, such as Defendants SALE and KOLB, can be held liable for civil rights violations that arise out of a governmental or proprietary function.

48.    Like the U.S. Constitution's First Amendment, Article I, §§ 2 and 3 of the Oregon Constitution protect Oregonians' freedom of religion.

49.    Acting under color of state law, Defendants have violated Plaintiff's constitutionally protected freedom of religion by attempting to dictate the terms on which Plaintiff may preach the gospel and threatening him with reassignment or dismissal for failure to comply.  Defendants have furthermore passed judgment upon Plaintiff's religious beliefs, deeming them "hateful," essentially labeling Plaintiff a fearmonger for expressing them, and thereby violating the constitutional requirement that government remain neutral toward religion.

50.    Defendants' actions neither serve a compelling government interest nor are narrowly tailored to serve such an interest.

**THIRD CAUSE OF ACTION:**
**DEPRIVATION OF FREEDOM OF SPEECH (FEDERAL)**
**[U.S. Const. amend. I; 42 U.S.C. § 1983]**
**Against All Defendants**

51.    Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 50 into this Paragraph as if fully set forth herein.

52.    Under 42 U.S.C. § 1983, anyone who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

53.    Under 42 U.S.C. § 1983, public bodies, like Defendant GPSD, and their officers, employees and agents acting within the scope of their employment, such as Defendants SALE and KOLB, can be held liable for civil rights violations that arise out of a governmental or proprietary function.

54.    The U.S. Constitution's First Amendment, as applied to states through the Fourteenth Amendment, prohibits public bodies from infringing on individuals' freedom of speech.  The Fourteenth Amendment prohibits public bodies from "depriv[ing] any person of life, *liberty*, or property without due process of law."  U.S. Const. amend. XIV, § 1 (emphasis added).

55.    Acting under color of state law, Defendants have violated Plaintiff's constitutionally protected freedom of speech by attempting to dictate the terms on which Plaintiff may preach the gospel and threatening him with reassignment or dismissal for failure to comply: Defendants have infringed on Plaintiff's freedom of speech by restricting what Plaintiff can say, how he can say it, where he can say it, whom he can say it to, and whom he can associate with for expressive purposes.

56.    Issues relating to marriage, gender, and sexuality are matters of public concern about which public-school teachers are as free as anyone else to publicly express their viewpoints, however popular or unpopular those viewpoints may be.

57.    Whenever Plaintiff discusses the biblical view of marriage, gender, and sexuality – whether via preaching, passing out tracts, or holding up signs – he is speaking on a matter of public concern.

58.    Whenever Plaintiff discusses the biblical view of marriage, gender, and sexuality – whether via preaching, passing out tracts, or holding up signs – he is doing so in his capacity as a private citizen.  In fact, he makes it a point not to wear clothing or carry gear bearing SMS' name, colors, and insignia, nor otherwise identify himself as a teacher employed by Defendant GPSD in any way, so his target audience will understand that his message is his own and not that of GPSD.

59.    Plaintiff's speech was a substantial and/or motivating factor in Defendants' threats to punish him via reassignment or dismissal.  *See* Exs. "B" and "D."  Defendants cannot show they would have taken any adverse employment action against Plaintiff even in the absence of Plaintiff's prohibited speech.

60.    Defendants have no adequate justification for treating Plaintiff differently from other members of the general public.

61.    Furthermore, Defendants' actions toward Plaintiff discriminate based on Plaintiff's viewpoint and would chill a person of ordinary firmness from continuing to engage in such speech, which is a substantial or motivating factor in Defendants' conduct.

62.    Defendants' actions neither serve a compelling government interest nor are narrowly tailored to serve such an interest and make abundantly clear that Defendants have a custom, policy, and practice of trying to silence Christians in their employ who dare to preach their views openly in the public square.

## FOURTH CAUSE OF ACTION:
## <u>DEPRIVATION OF FREEDOM OF SPEECH (STATE)</u>
### [Or. Const. art. I, § 8; ORS 30.260-30.300]
### Against All Defendants

63.     Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 62 into this Paragraph as if fully set forth herein.

64.     Under ORS 30.265(1), public bodies, like Defendant GPSD, and their officers, employees and agents acting within the scope of their employment, such as Defendants SALE and KOLB, can be held liable for civil rights violations that arise out of a governmental or proprietary function.

65.     Like the U.S. Constitution's First Amendment, Article I, § 8 of the Oregon Constitution protects Oregonians' freedom of speech.

66.     Acting under color of state law, Defendants have violated Plaintiff's constitutionally protected freedom of speech by attempting to dictate the terms on which Plaintiff may preach the gospel and threatening him with reassignment or dismissal for failure to comply.  Defendants have infringed on Plaintiff's freedom of speech by restricting what Plaintiff can say, how he can say it, where he can say it, whom he can say it to, and whom he can associate with for expressive purposes.

67.     Issues relating to marriage, gender, and sexuality are matters of public concern about which public-school teachers are as free as anyone else to publicly express their viewpoints, however popular or unpopular those viewpoints may be.

68.     Whenever Plaintiff discusses the biblical view of marriage, gender, and sexuality – whether via preaching, passing out tracts, or holding up signs – he is (1) speaking on a matter of public concern.

69.     Whenever Plaintiff discusses the biblical view of marriage, gender, and sexuality – whether via preaching, passing out tracts, or holding up signs – he is doing so in his capacity as a private citizen.  In fact, he makes it a point not to

wear clothing or carry gear bearing SMS' name, colors, and insignia, nor otherwise identify himself as a teacher employed by Defendant GPSD in any way, so his target audience will understand that his message is his own and not that of GPSD.

70.    Plaintiff's speech was a substantial and/or motivating factor in Defendants' threats to punish him via reassignment or dismissal.  *See* Exs. "B" and "D."  Defendants cannot show they would have taken any adverse employment action against Plaintiff even in the absence of Plaintiff's prohibited speech.

71.    Defendants have no adequate justification for treating Plaintiff differently from other members of the general public.

72.    Furthermore, Defendants' actions toward Plaintiff discriminate based on Plaintiff's viewpoint and would chill a person of ordinary firmness from continuing to engage in such speech, which is a substantial or motivating factor in Defendants' conduct.

73.    Defendants' actions neither serve a compelling government interest nor are narrowly tailored to serve such an interest and make abundantly clear that Defendants have a custom, policy, and practice of trying to silence Christians in their employ who dare to preach their views openly in the public square.

### FIFTH CAUSE OF ACTION:
### <u>DEPRIVATION OF FREEDOM OF ASSOCIATION (FEDERAL)</u>
### [U.S. Const. amend. I; 42 U.S.C. § 1983]
### Against All Defendants

74.    Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 73 into this Paragraph as if fully set forth herein.

75.    Under 42 U.S.C. § 1983, anyone who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

injured in an action at law, suit in equity, or other proper proceeding for redress[.]" Under 42 U.S.C. § 1983, public bodies, like Defendant GPSD, and their officers, employees and agents acting within the scope of their employment, such as Defendants SALE and KOLB, can be held liable for civil rights violations that arise out of a governmental or proprietary function.

76.     The U.S. Constitution's First Amendment, as applied to states through the Fourteenth Amendment, prohibits local governing bodies from infringing on individuals' freedom of assembly.  The Fourteenth Amendment prohibits local governing bodies from "depriv[ing] any person of life, ***liberty***, or property without due process of law."  U.S. Const. amend. XIV, § 1 (emphasis added).

77.     Acting under color of state law, Defendants have violated Plaintiff's constitutionally protected freedom of association by restricting whom he can associate with for expressive purposes.  Defendants' actions neither serve a compelling government interest nor are narrowly tailored to serve such an interest.

78.     When Plaintiff engages in his evangelism activities, he and anyone with whom he associates for expressive purposes is engaged in constitutionally protected activity.  Defendants' actions would chill a person of ordinary firmness from continuing to engage in such activities, which are a substantial or motivating factor in Defendants' conduct.

### SIXTH CAUSE OF ACTION:
### DEPRIVATION OF FREEDOM OF ASSOCIATION (STATE)
### [Or. Const. art. I, § 26; ORS 30.260-30.300]
### Against All Defendants

79.     Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 78 into this Paragraph as if fully set forth herein.

80.     Under ORS 30.265(1), public bodies, like Defendant GPSD, and their officers, employees and agents acting within the scope of their employment, such

_____

as Defendants SALE and KOLB, can be held liable for civil rights violations that arise out of a governmental or proprietary function.

81.     Like the U.S. Constitution's First Amendment, Article I, § 26 of the Oregon Constitution protects Oregonians' freedom of association.

82.     Acting under color of state law, Defendants have violated Plaintiff's constitutionally protected freedom of association by restricting whom he can associate with for expressive purposes.  Defendants' actions neither serve a compelling government interest nor are narrowly tailored to serve such an interest.

83.     When Plaintiff engages in his evangelism activities, he and anyone with whom he associates for expressive purposes is engaged in constitutionally protected activity.  Defendants' actions would chill a person of ordinary firmness from continuing to engage in such activities, which are a substantial or motivating factor in Defendants' conduct.

## SEVENTH CAUSE OF ACTION:
## VIOLATION OF FEDERAL EMPLOYMENT LAW
### [42 U.S.C. § 2000e *et seq.*]
### Against Defendant GPSD

84.     Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 83 into this Paragraph as if fully set forth herein.

85.     Title VII prohibits employers from discriminating on the basis of religion.

86.     For purposes of Title VII, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year …"  42 U.S.C. § 2000e(b).  The term "person" includes governments.  42 U.S.C. § 2000e(a).

87.     Defendant GPSD qualifies as an employer under Title VII.

88.     The term "religion," for purposes of Title VII, "includes **_all_** aspects of religious observance and **_practice_**, as well as **_belief_** …" 42 U.S.C. § 2000e(j) (emphasis added).

89.     In threatening to punish Plaintiff with reassignment or dismissal for expressing his biblically-based views on marriage, gender, and sexuality, Defendants have discriminated against Plaintiff on the basis of his religion.  Such threats constitute adverse employment actions.

90.     Defendants' actions have made clear that Defendants are hostile to Plaintiff's religious viewpoint and impliedly grant to Plaintiff's fellow GPSD teachers who do not share his viewpoint the privilege of being able to express their views without fear of punishment.

**EIGHTH CAUSE OF ACTION:**
**VIOLATION OF STATE EMPLOYMENT LAW**
**[ORS 659A.030(5)]**
**Against Defendant GPSD**

91.     Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 90 into this Paragraph as if fully set forth herein.

92.     ORS 659A.030(1)(a) prohibits employers from discriminating on the basis of religion.

93.     Defendant GPSD qualifies as an employer for purposes of ORS 659A.030(1)(a).

94.     In threatening to punish Plaintiff with reassignment or dismissal for expressing his biblically-based views on marriage, gender, and sexuality, Defendant GPSD has discriminated against Plaintiff on the basis of his religion. Such threats constitute adverse employment actions.

## NINTH CAUSE OF ACTION:
## AIDING AND ABETTING RELIGIOUS DISCRIMINATION
### [ORS 659A.030(1)(g)]
### Against Defendants KOLB and SALE

95.    Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 94 into this Paragraph as if fully set forth herein.

96.    ORS 659A.030(1)(g) prohibits individuals from aiding and abetting an employer in discrimination on the basis of religion.

97.    In threatening to punish Plaintiff with reassignment or dismissal for expressing his biblically-based views on marriage, gender, and sexuality, Defendants KOLB and SALE have aided and abetted Defendant GPSD's discrimination against Plaintiff on the basis of his religion.  Such threats constitute adverse employment actions.

## TENTH CAUSE OF ACTION:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against All Defendants

98.    Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 97 into this Paragraph as if fully set forth herein.

99.    In threatening to punish Plaintiff with reassignment or dismissal for expressing his biblically-based views on marriage, gender, and sexuality, Defendants intended to inflict severe emotional distress on Plaintiff and did cause Plaintiff to suffer such severe emotional distress.  Defendants knew such distress would be certain, or substantially certain, to result from their conduct, as they rendered Plaintiff – the sole breadwinner of a family of six – fearful of being fired in response to another complaint from a fellow GPSD employee, the parent of a GPSD student, or a student who happened to see him participating in evangelism activities and take offense to his speech.

100.    Defendants' acts constitute an extraordinary breach of the bounds of socially tolerable conduct, as the U.S. Supreme Court has made abundantly clear that government officials cannot impose regulations that are hostile to the religious beliefs of affected citizens or passes judgment upon religious beliefs and practices. Defendants have done that here.

## REQUEST FOR DECLARATORY RELIEF

101.    Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 100 into this Paragraph as if fully set forth herein.

102.    The Free Exercise Clause of the U.S. Constitution's First Amendment protects against governmental hostility which is masked as well as overt.  Official action that targets religious conduct for distinctive treatment accordingly violates both the First Amendment and the Oregon Constitution.

103.    The restrictions that Defendants have imposed upon Plaintiff specifically target Plaintiff's religiously motivated expression in the name of "equity, diversity, and inclusion."  Accordingly, Plaintiff seeks a declaration that the restrictions Defendants have imposed on Plaintiff are unconstitutional.

## REQUEST FOR INJUNCTIVE RELIEF

104.    Plaintiff refers to and hereby incorporates by reference the allegations set forth in Paragraphs 1 through 103 into this Paragraph as if fully set forth herein.

105.    Plaintiff requests that the Court preliminarily and permanently enjoin all Defendants from enforcing their threats of adverse employment actions that may result from Plaintiff's exercise of his constitutionally protected freedoms.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

## ON ALL CAUSES OF ACTION:

1.    For declaratory and injunctive relief, as stated *supra*;

2.      For nominal damages;

3.      For economic damages against all Defendants in an amount according to proof at trial;

4.      For non-economic damages against all Defendants in the amount of $150,000;

5.      For punitive damages in an amount to be determined by the Court;

6.      For attorney's fees and costs associated with bringing and maintaining this action in accordance with the law; and

7.      For such other and further relief as the Court may deem proper.


Dated: June 9, 2021                    PACIFIC JUSTICE INSTITUTE
                                       __/s/ *RAY D. HACKE*_____
                                       Ray D. Hacke
                                       Attorney for Plaintiff
                                       RYAN DOUGLAS CLARK

## **VERIFICATION**

Under penalty of perjury under the laws of the State of Oregon, the undersigned certifies that the statements set forth in this instrument are true and correct except as to matters therein stated to be on information and belief, if any, and as to those matters, and as to such matters, the undersigned verily believes the same to be true.

Date: May 9, 2021

Ryan Douglas Clark

## PROOF OF SERVICE

I am employed in the County of Marion, State of Oregon.  I am over the age of eighteen and not a party to the within action; my business address is 1850 45th Ave., Suite 33, Salem, OR 97305.

On or about June 9, 2021, I served the following documents on the interested parties by placing a true copy thereof enclosed in sealed envelope(s) addressed to said parties:

**VERIFIED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS [42 U.S.C. § 1983; ORS 30.260-30.300], VIOLATION OF STATE EMPLOYMENT LAW [ORS 659A.030(1)(a) and (g)], AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

### PLEASE SEE ATTACHED SERVICE LIST

_____BY MAIL:  I am readily familiar with the firm's practice of collection and processing of correspondence for mailing.  Under that practice, it would be deposited with the U.S. postal service on that same date with postage thereon fully prepaid at Salem, Oregon in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

__X__BY PERSONAL SERVICE:  I caused such envelope to be delivered by hand to the office of the addressee(s).

_____BY FACSIMILE TRANSMISSION:  The facsimile machine I used complied with California Rules of Court 2003(3) and no error was reported by the machine.  Pursuant to rule 2005(i), I caused the machine to print a record of the transmission, a copy of which is attached to this proof of service.

_____(State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

__X__(Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on June 9, 2021, at Salem, Oregon.

_/s/ RAY D. HACKE_____
Ray D. Hacke

## SERVICE LIST

Nancy Hungerford
The Hungerford Law Firm LLP
653 South Center St.
P.O. Box 3010
Oregon City, OR 97045

Kirk Kolb
Superintendent
Grants Pass School District
725 NE Dean Drive
Grants Pass, OR 97526

Barrett Sale
Principal
South Middle School
350 West Harbeck
Grants Pass, OR 97527

# EXHIBIT "A"



May 11, 2021

*Oregon School Boards Association in cooperation with Special Districts Association of Oregon*

Ray Hacke                                   Email only
Attorney at Law
Pacific Justice Institute
PO Box 5229
Salem, OR  97304

_____

**Claims Office**

P.O. Box 23879

Tigard, Oregon

97281-3879

503-670-7066

1-800-305-1736

Fax: 503-620-9817

RE:     Your Client:   Ryan Clark
        Our Client:    Grants Pass School District

Dear Mr. Hacke:

Special Districts Association of Oregon, through the PACE Trust, administers claims on behalf of the Grants Pass School District.   I am in possession of your letter dated May 6, 2021.

I am reviewing documents sent to me by the District.  I can be reached at 503-706-6390 (cell).

Sincerely,

_____

**pace.osba.org**

*Teri Dragoo*

Teri Dragoo
Senior Claims Consultant
503-906-7237
503-706-6390
tdragoo@sdao.com

cc:    Kirk Kolb
       Sherry Ely

# EXHIBIT "B"



# SOUTH MIDDLE SCHOOL

| | |
|---|---|
| **Principal** | Barret Sale |
| **Assistant Principal** | Robert Lingo |
| **Assistant Principal** | Tonya Reimer |

February 26, 2021
Ryan Clark
South Middle School

Regarding: **Complaint about staff member involved in unprofessional activities.**

Mr. Sale, principal at South Middle School, received a complaint from Elani Pienaar, Band teacher at South Middle School, on Tuesday, February 16th, 2021, that Ryan Clark, Elective teacher at South Middle School, was involved and participating with a local group known to use fear tactics and to harass and intimidate people on February 14th, 2021. Ms. Pienaar communicated a concern about the message this sends to students and parents, specifically students who are a part of the LGBTQ+ community. As a staff member at South Middle School, Ms. Pienaar also stated she does not feel safe working in the same building as Mr. Clark.

The investigation examined the incident on February 14th, 2021, to determine if it did violate Board Resolution No. 2021-03 – Grants Pass School District Equity, Diversity, and Inclusion Resolution, which states that the District "is committed to a school district that provides equitable access and learning opportunities for all students." The resolution goes on to state that "we are committed to welcoming and safe learning environments for all students regardless of race, religion, gender, sex, or ability."

Mr. Sale also used a document (Gender & First Name Change Process for Transgender Students in ODE Systems) previously provided by Mr. Huber-Kantola, Director of Human Resources in Grants Pass School District, to Mr. Clark. Specifically, the memo states that "we value equity for every student. For students to be successful in their academic lives, they must be safe in their school environment." Furthermore, the document states that "Oregon law prohibits discrimination based on sexual orientation which in Oregon includes gender identity."

Mr. Sale also used Ethical Educator standards from the Teacher Standards and Practices Commission, Division 20 – Standards for Competent and ethical Performance of Oregon Educators, specifically 584-020-0020 – Supervision and Evaluation which states that the "competent educator is a student of human behavior and uses this knowledge to provide a climate that is conducive to learning and that respects the right of all persons without discrimination." Additionally, 584-020-0020 – Human Relations and Communications states that the "competent educator works effectively with others – Students, staff, parents, and patrons. The competent educator is aware of the ways the community identifies with the school, as well as community needs and ways the school program is designed to meet these needs. The competent educator can communicate with knowledge, clarify, and judgment about educational matters, the school, and the needs of students." Additionally, 584-020-0040 – Grounds for Disciplinary Action, specifically in section (5) states that "conduct constituting gross unfitness may include conduct occurring outside of school hours or off school premises when such conduct bears a demonstrable relationship to the educator's ability to fulfill professional responsibilities effectively.

Lastly, Mr. Sale also used notes and expectations from a previous meeting between Mr. Clark, Mr. Huber-Kantola, Ms. Evens (Director of Secondary Education), Ms. Jarvis (GPEA President), and Mr. Sale. A

summary of that meeting advised Mr. Clark that he should not harass students and/or parents inside or outside of school; he was advised to not hold signs regarding the LGBTQ+ community; he was advised to not hand out pamphlets to students/parents inside or outside of school; he was advised to follow all ODE guidelines and documents sent to him in an email; he was also advised that although he (Mr. Clark) may not perceive that he is harassing students and/or parents, but they may see it as harassment and there will likely be considered harassment.

Using the parameters set out above as a guide, Principal Sale did an extensive investigation and found the following.

Principal Sale interviewed or received written feedback from five sources associated with the situation.

**People Interviewed:**

| Name | Position |
|------|----------|
| Elani Pienaar | Band teacher, South Middle School |
| Ryan Clark | Elective teacher, South Middle School |
| Mickey Jarvis | GPEA President |
| Dan Huber-Kantola | Director of HR, GPSD7 |
| Trish Evens | Director of Secondary Ed., GPSD7 |

**Regarding Mr. Clark's involvement and participation with a local group known to use fear tactics and to harass and intimidate people, specifically on February 14th, 2021.**

**Information from the investigation process:**

**Ms. Pienaar**
Ms. Pienaar sent the following email to Mr. Sale, wishing to speak with him regarding concerns she had with a co-worker at South Middle School.

Hi Barret,

I am emailing you with concerns of my co-worker Ryan Clark who teaches here at SMS. On Sunday I was in line at the vaccine clinic and members of the "RV Saltshakers" were there "open air preaching" and attempting to hand out materials to people in line. The RV Saltshakers are a hate group that are present at a lot of town events such as the Growers Market, flea markets, Boatnik, the Pear Blossom Festival, etc. This group is known to picket Planned Parenthood clinics, and actively speak out against LGBTQ+ and immigrant communities using fear tactics, harassment, and intimidation. On Sunday I recognized my co-worker, Ryan Clark, participating with the RV Saltshakers. When I got home, it did not take me a long time to discover that Ryan is an active member of this group. I found multiple videos and pictures of him participating in these events and speaking out against the groups listed above. In particular, I found a video of him picketing at Planned Parenthood that mentions his felony and the fact that he is a middle school teacher. I also learned that a close friend was verbally harassed by Ryan Clark at the women's march two years ago in front of her then high school daughter.

With all this new found information, I am concerned about the message that this sends to students and parents. At South Middle School we say that we welcome ALL students. It is contradictory for Mr. Clark to be a part of a staff that communicates this message. Imagine the confusion for a student if they heard their teacher say they are safe, loved and accepted at school but then saw them participating alongside a hate group at a town event that communicates the exact opposite message. Particularly I am worried for our students who are diverse and a part of the LGBTQ+ community, and the damaging

effects that it could cause by them discovering that one of their teachers is against them. Also I want to mention that I do not feel safe working in the same building as him.

I ask that you pass this message along to whoever needs to see it, and carefully consider the danger of having him teach students.

Thank you,
Elani Pienaar

Mr. Sale met with Ms. Pienaar on Tuesday, February 16th, 2021 and again on Monday, February 22nd, 2021 to clarify events and statements after having talked and met with Mr. Clark on Thursday, February 18th, 2021.

Specifically, Mr. Sale asked Ms. Pienaar if she saw Mr. Clark holding any signs. Her response was that she did not see Mr. Clark holding any signs but members of his group were. She also provided a picture which is attached to this Response to Complaint. Mr. Sale also asked Ms. Pienaar if she saw Mr. Clark actively distributing pamphlets, to which she said that she did not. Mr. Sale also asked Ms. Pienaar if she saw Mr. Clark on a loudspeaker or bullhorn speaking to people, to which she said that she did not. As part of that meeting,

Ms. Pienaar also clarified that the videos and images that she had seen (i.e. picketing, using fear tactics, harassing and intimidating people) seemed to appear in the past and were not of the weekend's vaccination clinic event. Ms. Pienaar clarified that she did not actively see Mr. Clark "do anything wrong [at the event]," and that her concern was raised when she got home, searched his name, and found many disturbing videos from the past come about. The picture Ms. Pienaar also provided was of two individuals – neither of which are Mr. Clark – holding signs regarding hell and Jesus Christ (see attached).

When asked if there were any other South MS or D7 staff present, Ms. Pienaar said that while she was there, she did not see any South MS or D7 staff.

## Mr. Clark

On Thursday, February 18th, Mr. Clark learned of the complaint from Ms. Pienaar and was able to meet as part of the investigation with his GPEA representative, Ms. Jarvis (GPEA president).

Before Mr. Sale asked questions as part of the investigatory process, Mr. Clark emailed the following response:

I can do whatever you need.  Yes I was there.  Although I do believe I could have, in my personal time, engaged in free speech activity there, I did not hold any signs, nor did I do any preaching.  That was intentional, since I am still carefully considering what I should do and how I should do those things, based on faithfulness to my convictions.   I understand that a ball has begun to roll, and anything and everything I do is under scrutiny.  It is why I am being very deliberate.  There is also much mis-information out there.  I have no felony, and am unfortunately the object of slander and hate on social media.  These things grieve me greatly, but I cannot control what others do.

On whatever level we can do, yes, I would like to speak to you soon, today.

Thank you

Below are questions that Mr. Sale asked (**bold**) and Mr. Clark's responses (following each question) from their meeting on the afternoon of February 18th, 2021:

- **Were you at the vaccination event this past weekend? Which days?**
  - Yes, on Sunday morning.
- **What happened there?**
  - I was there to make sure people were respectful and honoring to individuals. I learned about the event earlier that morning that some individuals were going to go to the fairgrounds to share/offer the gospel to anyone that would want to hear. At an event like a vaccination clinic, there can be a lot of fear and concern. I was there to pray for people and make sure we knew the boundaries and to make sure others did not get themselves into trouble. If there was to be a conflict, I was there just to make sure we handled the conflict well.
  - In conversations with authorities, some of the individuals there to share the gospel, people have looked to me for some type of guidance. I don't get to tell people what to do, but to deescalate; they tend to respond to be.
  - We checked in with others (Tamara that runs the fairgrounds, security guard, and a lady in charge of the clinic itself), and clarified expectations.
  - I did not talk with police authorities but the police did show up. Tamara, the lady running the fairgrounds, came over to the young man that was preaching and I walked over to where he was speaking with her just to listen to their conversation.
  - I did engage with the security guard a little bit when he asked people to not do something in a certain area. The lady that was in charge of the clinic itself and clarified what the security guard was asking. Even though I didn't agree with what he/they were asking, we complied with their requests to keep a peaceful interaction.
- **Are you a supervisor of that group?**
  - No, more of a mediator. I wanted to make sure people knew the boundaries and respected them.
  - Again, I came because I wanted to make sure that I was there to contribute to the peaceful interaction.
- **Were you there as a Saltshaker?**
  - No, I was not there as a saltshaker. It was not a saltshaker event. There were some people that are part of the Saltshakers that were also there and there was some overlap, but it was not an official saltshaker event.
- **Were you holding signs?**
  - No.
- **Were you distributing pamphlets? If so, may I ask what the pamphlets said?**
  - I had some on me but did not distribute them. They were simple gospel tracks.
- **Did you see other D7 staff there? SMS staff?**
  - I did not recognize any D7 (or SMS) staff there.
- **Would you categorize your interactions – either you or the other individual(s) – as "harassing"?**
  - No…if anything, there was a lady who was upset with talking with someone else. This lady was stating her opinion; some others might say that she was harassing us but I wouldn't classify her interactions toward us/me as harassment.
  - There was very minimal interaction with people that we had. For me, I was just trying to be aware.
  - There was a young man that was preaching, but he had gotten permission. I left very soon after that because I didn't feel right about staying there after talking with my wife on the phone. I was not there very long.
  - Again, I showed up because I felt responsible to contribute to peaceful engagement as much as possible.
- **Were you speaking over the megaphone?**
  - No
- **What do you remember from our meeting on 1/29 (with Directors Huber-Kantola & Evens, Ms. Jarvis, you, and me)?**

- o A recap of documents sent by Danny before the meeting.
- o Recollection: Follow-up from follow up with (staff member who made previous complaint). Clarifying the district position, the equality/equity Resolution at the board meeting that was accepted.
- o Clarifying for me from ODE, TSPC, and D7 expect from me on those issues.
- o I understood that any of my previous activity was no longer really going to be scrutinized by that because it has been presented.
- o I recall discussing what could happen if things move forward about my behavior;
  - ▪ Mickey (Jarvis) clarified and gave the example of holding a sign.
- o I understood that my actions and things are scrutinized.
- **I am starting to be more concerned about staff perception. What are you going to do about it? Your reputation? There are at least two female staff that are afraid to be in a room with you. I don't know that this will be the last staff member that sees you out in public. Their first impression of you may be affiliated with a group with bullhorns, signs, and pamphlets. How do we fix others' perceptions of you?**
  - o I know we are in a more polarized world right now, and I wish it wasn't the case. There may always be people that are not happy with the message I speak outside of school time (i.e. the presentation of the gospel). I want people to know me as a teacher and not what they think of other people's perceptions of me. I would hope that staff would know me and have some kind of relationship with me and hear from students that my classroom is a good, fun place to be. I don't know if there's time for that to happen. I went out of the way to make sure I was following what Danny asked last time. This doesn't seem like a complaint from this weekend and is focused on previous events.
  - o I understand that…I was not convicted as a felon. I did something that I opened a door to.
  - o Since that meeting with Danny, I have done nothing that goes against what he asked of me.

Later on that day, Mr. Clark also emailed Director Huber-Kantola and copied Director Evens, Ms. Jarvis, and Mr. Sale. It stated:

Greetings,

So much is going on, and while I knew more would come of this, I did not want, nor did I expect more to come this soon. I've just gotten comfortable teaching my 7th grade classroom.

A new complaint just came in. Perhaps I should not have waited to personally follow up with you (any of you), so that I could better explain my situation outside of an official complaint capacity. I still would like that to happen. In particular, since you led the last meeting Danny, I wanted to at least speak straight to you, out of respect. I heard your last message clear. I still have not fully processed what that will mean for my personal activities moving forward. But because of that conversation, for the record, I have said nothing publicly about any issue listed in the Equity and Diversity Policy adopted by the board. I still have much to pray through on that. And whatever else people think I am or am not doing, I take very seriously the call to "Love my neighbor", and act motivated by love. I needed to at least say that to you directly. Thank you.

Ryan Clark

**Ms. Jarvis**

On Friday, February 19th, Mr. Sale emailed a copy of notes taken from the Thursday, Feb 18th meeting between himself, Mr. Clark, and Ms. Jarvis. He asked if his notes of questions and responses were captured accurately. Ms. Jarvis responded on Wednesday, February 24th that she saw no changes were needed. ("No changes from me…Thank you for checking.")


**Director Huber-Kantola & Director Evens**

As part of the investigatory process, Mr. Sale was provided a summary and expectations from Director Huber-Kantola regarding a meeting on January 29th, 2021. Specific to this incident, Director Huber-Kantola provided the expectations he and Director Evens spoke to Mr. Clark which are below.

- You are to treat all students with respect and dignity.
- You are to provide a welcoming atmosphere for all students.
- Students who are transgender or LGBQT and their parents have to feel safe to be in your classroom or have their students in your classroom.
- You must follow all ODE guidance, School Board Policies and TSPC Ethical Educator requirements in fulfilling your duties as a teacher in District #7.
- The Ethical Educator calls for the competent educator to work effectively with others –Students, staff, parent and patrons. The competent educator is aware of the way the community identifies with the school, as well as community needs. The Ethical Educator also states that, "Conduct constituting gross unfitness may include conduct occurring outside of school hours or off school premises when such conduct bears a demonstrable relationship to the educator's ability to fulfill professional responsibilities effectively. Specifically tying all of this together in this case depending on the outcome of a thorough investigation, activities outside of the school premises that could keep you from fulfilling your ethical responsibilities may include:
  - Holding signs up to students and parents that LGBQT people are going to hell could make students feel unwelcome in your classroom setting or it could make parents feel uncomfortable having their student(s) in your classroom;
  - Approaching students or their parents with language that they are bound to hell for being LGBQT could make students feel unwelcome in your classroom setting or it could make parents feel uncomfortable having their students in your classroom;
  - Actions that are seen as harassing students or their parents in public based on their religious preferences could make students feel unwelcomed in your classroom or it could make parents feel uncomfortable having their students in your classroom.
- You are expected to conduct yourself in a manner both inside and outside of the classroom that allows you to meet your professional responsibilities as described above.


**Finding**:
Based on the facts found in the investigation process, Mr. Sale did not find evidence from Ms. Pienaar (either her written and verbal recount or photo that was taken) that Mr. Clark engaged in activity that he was specifically asked not to partake in (i.e. holding signs, handing out pamphlets). Also, it does appear that Mr. Clark is currently following all ODE guidance, School Board Policies, and TSPC Ethical Educator requirements that was specifically given to him by Directors Huber-Kantola and Evens in a previous meeting. There does not appear to be a breech in expectations laid out for him at this point, and the involvement with individuals at the vaccination clinic on February 14th, 2021 does not appear to violate any expectations given to Mr. Clark.

In regards to Board Resolution No. 2021-03 – Grants Pass School District Equity, Diversity, and Inclusion Resolution, it does not appear that Mr. Clark has engaged in activity since his previous meeting with Director Huber-Kantola that would be considered having or creating an unwelcoming and unsafe learning environment for all students regardless of race, religion, gender, sex, or ability.

In regards to the Gender & First Name Change Process for Transgender Students in ODE Systems, it does not appear that Mr. Clark has violated the memo that states that "we value equity for every student. For students to be successful in their academic lives, they must be safe in their school environment" since his previous meeting with Director Huber-Kantola. Moreover, it does not appear that Mr. Clark has violated Oregon law which "prohibits discrimination based on sexual orientation which…includes gender identity" since his previous meeting with Director Huber-Kantola.

In regards to Ethical Educator standards from the TSPC, it does not appear that Mr. Clark has violated any of the Division 20 – Standards for Competent and Ethical Performance of Oregon Educators, since his previous meeting with Director Huber-Kantola.

Lastly, in regards to following expectations from a previous meeting between Mr. Clark, Mr. Huber-Kantola, Ms. Evens (Director of Secondary Education), Ms. Jarvis (GPEA President), and Mr. Sale, it does not appear that Mr. Clark has violated those expectations. Those expectations include that he was advised that he should not harass students and/or parents inside or outside of school; that he not hold signs regarding the LGBTQ+ community; that he not hand out pamphlets to students/parents inside or outside of school; that he follow all ODE guidelines and documents sent to him in an email.

Mr. Sale concludes that although no violation in regards to previous expectations appear to have been committed, that questions, concerns, and complaints may continue to arise from students, parents, and staff members about Mr. Clark's involvement (past, present, and future) with community groups that may be seen as using fear tactics and to harass and intimidate people.

Mr. Sale also concludes that because of his involvement with such community groups, he is also concerned about the message this may send to students and parents, specifically students who are part of the LGBTQ2SIA+ community, if Mr. Clark continues to be involved with these groups. There is a growing concern that Mr. Sale shared with Mr. Clark during the investigation process that there are at least two staff members that are afraid to be in a room with him. Although Mr. Clark has only been at South Middle School for a short period of time, there are perceptions of him that he may be an unsafe person due to his involvement with certain community groups that are seen within the community as "hate groups" because of their use of fear tactics and their harassment and intimidation of people. Although Mr. Clark has not directly been engaged with this since his previous meeting with Director Huber-Kantola, his continued involvement with community groups and/or individuals that belong to these groups leads others to believe that he may be an unsafe person because of who he is affiliated with.


**Recommendations:**
South Middle School and District 7 will continue to remind all staff, and Mr. Clark, to adhere to all ODE guidance, School Board Policies, and TSPC Ethical Educator requirements in fulfilling all duties as teachers in District 7.

South Middle School and District 7 will continue to remind all staff, and Mr. Clark, to treat all students with respect and dignity, and to create and provide a welcoming atmosphere for all students. Students who are transgender or part of the LGBTQ2SIA+ community, and their parents, will feel safe to be in every teacher's classroom or have their student(s) feel safe in every teacher's classroom.

South Middle School and District 7 will continue to remind all staff, and Mr. Clark, to hold themselves to TSPC's Ethical Educator standards. Part of these standards call for all staff, and Mr. Clark, to provide a climate that is conducive to learning and that respects the right of all persons without discrimination. Additionally, the standards also call for all staff, and Mr. Clark, to be aware of the ways the community identifies with the school, as well as be aware of community needs and ways the school program is designed to meet these needs. Additionally, the standards also call for all staff, and Mr. Clark, to be able to communicate with knowledge, clarity, and judgment about educational matters, the school, and the needs of students. Lastly, the standards state that for all staff, and Mr. Clark, conduct constituting gross unfitness may include conduct occurring outside of school hours or off school premises when such conduct bears a demonstrable relationship to the educator's ability to fulfill professional responsibilities effectively. In sum, all staff, and Mr. Clark, needs to conduct themselves in a manner both inside and outside of the classroom and school that allows them to meet their professional responsibilities.

Because Mr. Clark is known to be a teacher in the local public schools, he may become the focus of public attention, or at least private communications between parents, community members, etc. if he continues to appear at public venues with others who carry such signs and make statements that LGBTQ2SIA+ individuals will go to tell.

There are First Amendment rights as well as rights under the Oregon Constitution to free speech.

The District prohibits and may consequence appearing at any school event with such a group, even if Mr. Clark is not holding a sign or shouting out the slogans. The District also prohibits such involvement at any youth gathering within the school district where students are likely to see Mr. Clark associating with groups expressing such opinions.

For social media sites, which are open to the public or a large number of people who may have children in the schools, we direct Mr. Clark not to participate in posting hateful messages about individuals protected by District policies on discrimination.

South Middle School and Mr. Sale will take steps to ensure that there is no retribution for the filing of this complaint.

South Middle School and Mr. Sale will take steps to ensure that all staff, including and especially Ms. Pienaar, feel safe while working at South Middle School and on District 7 properties.

In accordance with Board Policy, either party involved in this investigation process may appeal the findings to the Superintendent within 10 days of the receipt of this finding.


**Respectfully,**


**Barret Sale**
**Principal, South Middle School**

# EXHIBIT "C"



**TEACHER STANDARDS AND PRACTICES COMMISSION**
250 Division Street N.E.  Salem, OR 97301
Phone:  (503) 378.3586
Fax:  (503) 378.3758
www.oregon.gov/tspc

Kate Brown, Governor

April 6, 2021

Ralph Wiser, Attorney at Law
7105 SW Varns St., Suite 250
Lake Oswego OR 97223

RE:  RYAN DOUGLAS CLARK

Dear Mr. Wiser

On December 15, 2020, the Teacher Standards and Practices Commission received a report pursuant to OAR 584-020-0041 from the Grants Pass School District, alleging possible professional misconduct by the above named educator. The report was investigated and a preliminary investigation report was prepared.

On April 2, 2021, the Teacher Standards and Practices Commission reviewed the preliminary investigation report and is taking no further action regarding the allegations included in the report, because the Commission was unable to find sufficient cause to charge the educator with professional misconduct pursuant to ORS 342.177.

Because the allegations were dismissed, pursuant to ORS 342.176, the documents and materials used in the investigation and the report of the Executive Director are confidential and **are not** subject to public inspection.

We have informed Ryan Clark and the Grants Pass School District of this decision. Thank you for your assistance in this matter.

Respectfully,

Trent J. Danowski
Director of Professional Practices

/jsk

Data Classification Level: 3 – Confidential
DO: Kandle

# EXHIBIT "D"



# Grants Pass School District No. 7

725 NE Dean Drive, Grants Pass, OR 97526 · Phone: (541) 474-5700
www.grantspass.k12.or.us · Fax: (541) 474-5705

OFFICE of the SUPERINTENDENT

March 19, 2021

Ryan Clark
566 Bridge Lane
Grants Pass, OR 97277

RE: Complaint response clarifications and appeal

Ryan,

The following is in response to your request for an appeals hearing regarding the findings and direction provided by Principal Sale on February 26, 2021. This response should be considered a letter of direction as outlined in the closing of this communication. In our email exchange you were not disputing any discipline since there was no disciplinary action taken. You communicated that you desired to seek clarifications regarding the expectations set forth by Principal Sale and Director Kantola. I asked for specific questions prior to our meeting on Tuesday March 16, 2021 for which you provided.

The following are the excerpts from the letter you provided with the specific questions. After each specific question, I have attempted to provide clarification in **bold** print.

Point 1: Mr. Sale states "Mr. Clark that he should not harass students and/or parents inside or outside of school; he was advised to not hold signs regarding the LGBTQ+ community; he was advised to not hand out pamphlets to students/parents inside or outside of school; he was advised to follow all ODE guidelines and documents sent to him in an email; he was also advised that although he (Mr. Clark) may not perceive that he is harassing students and/or parents, but they may see it as harassment and there will likely be considered harassment."

    a.  What does harass mean specifically? **Per Board Policy GBNA-AR, "Harassment" is unwelcome conduct that is based on race, color, religion, sex (including pregnancy), sexual orientation, national orientation, age, disability, or genetic information.**

    b.  What signs am I advised not to hold regarding the LGBTQ+ or any other community? **This would be a first amendment right outside of your responsibilities and duties as a school employee; however, should your participation in holding such signage result in a "substantial disruption" in the school setting, it may lead to action by the District, including reassignment. Substantial disruption would include but is not limited to students not feeling safe in the classroom or in your presence while at school.**

    c.  What pamphlets am I not to hand out? **This would also be a first amendment right, outside of your responsibilities and duties as a school employee, however, should your participation in distributing any type of pamphlets result in a "substantial disruption" in the school setting, it may lead to action by the District, including**

*Building Bridges to the Future*

reassignment.  Substantial disruption would include but is not limited to students not feeling safe in the classroom or in your presence while at school.

d.  Is Mr. Clark being directed not to have content on the internet or social media regarding the activities to which the district objects and/or seeks to prohibit? **This would also be a first amendment right outside of your responsibilities and duties as a school employee, however, should your internet or social media content result in a "substantial disruption" in the school setting, it may lead to discipline.  Substantial disruption would include but is not limited to students not feeling safe in the classroom or in your presence while at school.**

Point 2:  Regarding Mr. Clark's involvement and participation with a local group known to use "fear tactics and to harass and intimidate people."

a.  What are the fear tactics? **Fear tactics would include behaviors that attempt to persuade by invoking feelings of insecurity and fear.  This may include but is not limited to the videoing of others while attempting to convey or persuade others with a specific message.  It could also include communicating messages that use language to invoke fear such as "You'll burn in hell if you do/don't' (fill in the blank).**

b.  What are the intimidation tactics? **Behaviors that would be perceived to make others be fearful or frightened.  This would also include but is not limited to the videoing of others while attempting to convey or persuade others with a specific message.  It could also include communicating messages that use language to invoke fear such as "You'll burn in hell if you do/don't' (fill in the blank).**

c.  What is the group? **In these matters, "the group" would be any associated, organized gathering of people that may be perceived as harassing or intimidating.**

d.  Is Mr. Clark being directed not to associate or be in the proximity of others that are engaging in the activities to which the district objects and/or seeks to prohibit?" **No, this would also be a first amendment right outside of your responsibilities and duties as a school employee, however, should your affiliation or association with such a group result in a "substantial disruption" in the school setting, it may lead to action by the District, including reassignment.  Substantial disruption would include but is not limited to students not feeling safe in the classroom or in your presence while at school.**

Point 3:  The Response to Complaint references "a summary and expectations from Director Huber-Kantola regarding a meeting on January 29, 2021.  Specific to this incident, Director Huber-Kantola provided the expectations...."  In referencing Ethical Educator guidelines "Conduct constituting gross unfitness may include conduct occurring outside of school hours or off school premises...." Including holding signs up to students and parents that LGBQT people are going to hell for being LGBQT could make students feel unwelcome in your classroom setting or it could make parents feel uncomfortable having their student(s) in your class.

a.  In reference to ODE guidelines, what specifically about this religious practice which occurs outside of working hours breaks the ethical educator guidelines? **This would be a first amendment right outside of your responsibilities and duties as a school employee.  ODE Guidelines and The Ethical Educator expectations are associated with your roles and responsibilities as a school district employee and teacher.**

b.  Is Mr. Clark being directed not to practice his religion in his place of worship or with other congregants that involve or include activities to which the district objects and/or seeks to prohibit?  What if these activities are public? **No, this would also be a first amendment right outside of your responsibilities and duties as a school employee;**

however, should such behavior result in a "substantial disruption" in the school setting, it may lead to action by the District, including reassignment. Substantial disruption would include but is not limited to students not feeling safe in the classroom or in your presence while at school.

Point 4: The complaint investigation finding of February 26, 2021 does not mention an accusation that Mr. Clark was holding signs or making statements. He was not accused of participating in any of the activities he was told not to (January 29, 2021 meeting with Director Kantola, Director Evens and his representative Mickey Jarvis) which would result in possible discipline up to and including dismissal.

1. Would Mr. Clark be found in violation of your expectations, while in his personal time away from school property (and work hours) if he holds a sign, in public, that says "OUR LIES, HATE, THEFT, GREED, LUST, PORN, FORNICATION, LGBTQ, ABORTION, AND ALL OTHER SIN EARN DEATH AND HELL. TRUST JESUS! BE SAVED!"? **No, this would also be a first amendment right outside of your responsibilities and duties as a school employee; however, should such behavior result in a "substantial disruption" in the school setting, it may lead to action by the District, including reassignment. Substantial disruption would include but is not limited to students not feeling safe in the classroom or in your presence while at school.** What if he is in a group where someone does, even if he doesn't? **Again, this is a protected behavior under the constitution; however, should such behavior result in a "substantial disruption" in the school setting, it may lead to action by the District, including reassignment. Substantial disruption would include but is not limited to students not feeling safe in the classroom or in your presence while at school.**

2. Mr. Clark has been involved in Anti-Abortion outreach, weekly, throughout Oregon and other states, for two years. Is he being directed to no longer do this outreach? **No this would also be a first amendment right outside of your responsibilities and duties as a school employee.**

3. What does it mean for Mr. Clark to be prohibited from being involved in youth gathering within the school District? Does that mean anywhere included in the geographic boundaries of D7? **Mr. Clark needs to avoid situations where minor students would see him projecting a message that is threatening or hateful toward LBGTQ individuals, either because he is holding a sign himself, or he is standing among a group where others are holding such signs. Because young persons are not readily able to disassociate a teacher's public advocacy (by being present in a group advocating against LBGTQ persons) and a teacher's likely conduct toward them at school, it is reasonable for the District to prohibit Mr. Clark's participation in any gatherings at youth events, whether school-related or not, within the geographic boundaries of D7.**

In summary, these clarifications are intended to ensure you are continually afforded your first amendment rights under the constitution while also upholding your responsibilities and obligations as an employee of Grants Pass School District 7. More specifically, those responsibilities are to ensure all students' emotional and physical safety and to foster a safe learning environment for all students. At times, the choices we make in our personal lives may have a consequential impact in our place of employment, and given our responsibilities as educators, we should carefully consider how we engage in public. **Failure to fulfill your responsibilities, as stated above, could lead to discipline, including dismissal on a first offense.**

Please consider the following expectations in an effort to further clarify as related to behaviors that may detract from your ability to uphold District and ODE policy on "Every Student Belongs."

- You should not identify yourself in any way in these public demonstrations or any social media posts accessible by persons outside of your personal acquaintances, as an employee of the school district, or as a teacher.
- You must be prepared to teach any curriculum assigned that pertains to the ODE statewide policy (such as lessons in a home room to familiarize students with the ODE policy and new board policy).
- You must be scrupulously fair and unbiased towards students known or believed to be LBGTQ.
- You must avoid all statements that express at school or at school events an attitude toward LBGTQ people that is different than that expressed in the Board and District policy.
- You should not to identify yourself as a teacher or GPSD employee on social media or the internet.
- When parents express concerns, you need to be prepared to meet with them and genuinely express your commitment to treat and teach all students fairly and considerately regardless of their sexual orientation, real or perceived.

Respectfully,

Kirk T. Kolb
Superintendent
Grants Pass School District 7

Cc.    Dan Huber-Kantola – Human Resources
       Barret Sale –South Middle School Principal
       Mickey Jarvis – GPEA

# EXHIBIT "E"



March 26, 2021

**SUBMITTED VIA E-MAIL**
Kirk Kolb
Superintendent
Grants Pass School District
725 NE Dean Drive
Grants Pass, OR 97526
E-mail: kkolb@grantspass.k12.or.us

> **Re: Ryan Clark, Seventh-Grade Teacher at South Middle School**
> **Efforts to Chill Constitutionally Protected Free Speech Rights**
> **Potential Religious Discrimination Under Federal Title VII/Oregon Law**

Dear Mr. Kolb:

The Pacific Justice Institute ("PJI") is a non-profit law firm whose mission includes assisting public employees facing possible religious discrimination and government encroachments on those employees' right to free speech. Please be advised that Ryan Clark, a teacher at South Middle School ("SMS") in the Grants Pass School District ("GPSD" or the District"), has retained PJI to represent him concerning the matters discussed herein. I thus hereby request that you forward all correspondence concerning this matter to me at PJI's Salem, Oregon office, the address for which is P.O. Box 5229, Salem, OR, 97304, and to me at my e-mail address, rhacke@pji.org. Thank you.

## I.  Background

Mr. Clark is a devout Christian who sincerely, and firmly, believes the Bible calls him to "go and make disciples of all nations" (Matthew 28:19). A necessary aspect of "making disciples," Mr. Clark believes, is preaching the gospel of Jesus Christ publicly to people he may not otherwise see at church or other religious gatherings (Romans 10:14). Mr. Clark also believes that part of making disciples is raising awareness of what the Bible declares to be sin and warning them of sin's eternal consequences (Ezekiel 33:8) so people at least have the opportunity to repent of their sins (Acts 2:38; John 3:18) and come to saving faith in Christ (2 Corinthians 7:10). It is within this context that Mr. Clark feels compelled to publicly express his biblically-based views on matters of public concern, including issues of gender and sexuality.

For these reasons, Mr. Clark regularly associates with groups of like-minded individuals who regularly engage in Christian evangelism at secular public gatherings in the Grants Pass area – the Saturday Growers' Market, various festivals (such as Boatnik), the Josephine County Fair, etc. At these events, Mr. Clark and others take turns preaching the gospel to those in attendance. When not preaching, members of these groups stand nearby holding signs containing gospel messages and passing out gospel tracts. Some of the aforementioned signs, the District should note, explicitly condemn hate, which the Bible declares to be sinful. Ltr. From Kirk Kolb, Superintendent, Grants Pass Sch. Dist., to Ryan Clark, Teacher, South Middle School, *Re: Complaint Response Clarifications*

Page 1 of 9

*and Appeal*, p. 3 (March 19, 2021) (hereinafter GPSD Ltr. when cited) [specifically, see Point 4, paragraph (1)]. The groups Mr. Clark associates with include CORE Ministries, Abolish Abortion Oregon, and RV Saltshakers. Some in the Grants Pass community inaccurately malign these groups as being hatemongers or accuse them of using "fear tactics," harassment, and intimidation. While the groups' message is, to some degree, provocative – the groups aim to stir the consciences of non-believers and thereby spark conversations that lead to making disciples – the groups' members generally try to be peaceful and non-confrontational: They refrain from using insults or abusive language and select their words carefully to avoid alienating potential listeners to the extent they can without watering down their message. Mr. Clark is no exception: When he preaches, he prefaces his comments with statements like, "If you have engaged in …": This way, Mr. Clark avoids making insinuations about, or leveling accusations toward, people he may be encountering for the first time that day. If an individual chooses not to engage in discussion with Mr. Clark, he lets that person walk on by without any further issue.

When attending these events, Mr. Clark does not wear clothing or carry gear bearing SMS' name, colors, and insignia, nor does he identify himself as a teacher at SMS in any way – his occupation is irrelevant to the message he wishes to preach. If his clothing or gear bears any symbols or messages at all, they are symbols or messages that relate to the gospel message he is preaching that day. Mr. Clark is also mindful of his role as a teacher at SMS and has made concerted efforts to comply with SMS, District, and Oregon Department of Education ("ODE") guidelines, both in and outside of the classroom, lest he face adverse employment action or sanctions against his teaching license. Mr. Clark has even foregone certain activities and avoided preaching certain messages out of a reasonable fear that he may face job-related discipline. Still, Mr. Clark remains steadfast in his biblical calling to preach the gospel to the people of Grants Pass.

Mr. Clark's evangelism activities have led certain colleagues at SMS to file complaints against him: Two of his fellow SMS teachers claim "they are afraid to be in a room with him," even though he has consistently demonstrated the utmost respect to colleagues and students, regardless of whether they share his beliefs. Barret Sale ("Principal Sale"), the principal of SMS, has investigated Mr. Clark's activities multiple times and absolved Mr. Clark of any wrongdoing. *See*, e.g., Principal Barret Sale, *Re: Compl. About Staff Member Involved in Unprofessional Activities*, pp. 6-7 (Feb. 26, 2021) (hereinafter Sale, *Re: Compl.*). Even so, Principal Sale cites an ongoing concern that Mr. Clark "may be an unsafe person because of who he is affiliated with" and that Mr. Clark's association with the above-referenced groups may undermine GPSD and SMS' efforts to show the Grants Pass community – and the parents and students whom the District and SMS serve – that "they are committed to welcoming and safe learning environments for all students[.]" *Id.* at pp. 1, 7. Principal Sale has thus prohibited Mr. Clark from posting on social media "hateful messages about individuals protected by District policies on discrimination" and appearing at "any youth gathering within the school district where students are likely to see Mr. Clark associating with groups expressing such opinions." *Id.* at p. 7.

On March 16, 2021, Mr. Clark met with GPSD officials via video conferencing to seek clarification about what, specifically, he is prohibited from doing. In a four-page letter to Mr. Clark dated March 19, 2021, the District attempted to address Mr. Clark's questions. While repeatedly acknowledging Mr. Clark's free speech rights, the District also attempts to do the following via the letter:

太平洋法律協會 chinese.pji.org | Instituto de Justicia Pacífico spanish.pji.org | 태평양 법률협회 korean.pji.org | Тихоокеанский Институт Правосудия russian.pji.org

- Define "harassment" as "unwelcome conduct" based on, among other factors, sexual orientation (a term which, presumably, includes gender identity) – *see* GPSD Ltr., p. 1 [Point 1, paragraph (a)];

- Repeatedly threaten him with discipline, including "reassignment" and "dismissal on a first offense," if he causes a substantial disruption at SMS, even though Mr. Clark has never done anything to cause a disruption, substantial or otherwise – *see* GPSD Ltr., pp. 2-3;

- Dictate what Mr. Clark can and cannot say when preaching the gospel – for instance, "attempt[ing] to persuade by invoking feelings of insecurity and fear," including telling listeners, "You'll burn in hell if you do/don't (fill in the blank)" – *see* GPSD Ltr., p. 2 [Point 2, paragraph (a)];

- Dictate which individuals or groups Mr. Clark may associate with based on the "perception" of such groups engaging in harassing or intimidating behavior – *see* GPSD Ltr., pp. 2 [Point 2, paragraph (c)] and 3 [Point 4, paragraph (3)]; and

- Prohibit Mr. Clark from participating in gatherings at youth events, school-related or otherwise – *see* GPSD Ltr., p. 3 [Point 4, paragraph (3)].

Incidentally, Mr. Clark engaged in evangelism activities on March 20, 2021 at the Saturday Growers' Market. At no point while preaching did Mr. Clark, or any of his fellow evangelists, carry signs, distribute tracts, or otherwise disseminate messages arguably disparaging the LGBTQ+ community. Mr. Clark did, however, mention hell, as he believes doing so is necessary to "speak the truth in love" (Ephesians 4:15). Standing nearby, and carrying flags featuring rainbow-colored stripes (signifying gay pride) or blue, pink, and white stripes (signifying transgender pride), were two young adults who make it a point to disrupt evangelism activities throughout Grants Pass. As Mr. Clark preached, two SMS science teachers, Cheyenne Davis and Sabrina Sheppard – who work in the same part of SMS as Mr. Clark and thus encounter him daily – spotted and approached him. As Ms. Sheppard appeared to be filming the encounter on her cell phone, Ms. Davis told Mr. Clark, "I'm shocked at you. It hurts my heart that you're so anti-love, man. I can't believe you're an educator." Before then, no one had said anything about Mr. Clark's employment as a teacher, and it was Ms. Davis – not Mr. Clark – who called attention to it. When Mr. Clark attempted to respond, Ms. Davis cut him off and said, "You're not a colleague of mine, ever again." When Mr. Clark said, "I'm just preaching the gospel," Ms. Davis responded, "I know what you stand for, brother," before turning and walking away. As she left, Ms. Davis told the people carrying the rainbow and transgender flags, "I'm sorry you have to deal with this." The District can view video of the encounter at the link below.[1]

## II.  **Legal Discussion**

Both the Oregon and U.S. constitutions protect individuals' right to freedom of speech. *See* Or. Const. art. I, § 8 and U.S. Const. amend. I. This right extends to religiously

---

[1] https://drive.google.com/file/d/1x7E31uJ7dbFk0X4X1t18ZTLWWRTnW-2C/view.
Page 3 of 9

motivated speech, including – and for purposes of this case, especially – the speech of public employees:

> "The framers of the constitution would shudder if they were aware of [government] effort[s] to erode the right to express religious opinions. Based on the history of governmental infringement of religious expression, they founded our nation and our state on the principles of freedom of speech and of religious expression and practice. ***Those rights are not forfeited in the workplace.***"

*Meltebeke v. Bureau of Labor & Indus.*, 120 Or. App. 273, 292 (1992) (Edmonds, J., concurring) (emphasis added) [citing *Merrick v. Bd. of Higher Educ.*, 116 Or. App. 258 (1992)].

"First Amendment rights, applied in light of the special characteristics of the school environment, are available to ***teachers*** and students. It can hardly be argued that either students or ***teachers*** shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969) (emphasis added). "[T]he majority of courts will apply *Tinker* where speech originating off campus is brought to school or the attention of school authorities. *J.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1103 (C.D. Cal. 2010). Article I, § 8 of the Oregon Constitution likewise restricts school districts' ability to restrict teachers' speech based on content or viewpoint. *Eagle Point Educ. Assn./SOBC/OEA v. Jackson Cnty. Sch. Dist. No. 9*, 880 F.3d 1097, 1108 (9th Cir. 2018) (hereinafter *Eagle Point*).

"Whether speech of a [public-school teacher] is constitutionally protected expression necessarily entails striking 'a balance between the interests of the teacher, as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 284 (1977) [quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)]. In other words, while government employers may restrict their employees' speech to some degree, any restrictions imposed must serve an interest that outweighs the employees' expressive rights. *Tucker v. Cal. Dept. of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) [citing *Pickering*].

### A. The District's Interest in a "Safe" Environment for Students and Fellow Teachers Does Not Outweigh Mr. Clark's Right to Speak Freely on Any Matter of Public Concern

A public employee claiming a violation of his free speech rights must establish that (1) the employee spoke on a matter of public concern; (2) the employee spoke as a private citizen and not a public employee; and (3) the employee's speech "was a 'substantial or motivating factor'" in any adverse employment action taken against the employee. *Eng v. Cooley*, 552 F.3d 1062, 1070-71 (9th Cir. 2009) [quoting *Freitag v. Ayers*, 468 F.3d 528, 543 (9th Cir. 2006)]. "[T]he political and moral conduct of the United States and its citizens … are matters of public import." *Snyder v. Phelps*, 562 U.S. 443, 454 (2011). Adverse employment actions, meanwhile, include, but are not limited to, threats of disciplinary action and creating an environment that is hostile toward an employee's religious practices and beliefs. *See*, e.g., *Herman v. Port of Astoria*, 2015 U.S. Dist.

LEXIS 160105 at **6-7 (D. Or. Nov. 28, 2015) [citing *Burlington Northern Santa Fe Ry. v. White*, 543 U.S. 53, 68 (2006), and *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007)] and *Hunt v. City of Portland*, 726 F. Supp. 2d 1244, 1268 (D. Or. 2010) [quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)].

Should a public employee make the showing required under *Eng*, cited *supra*, the burden shifts to the government to show that either (1) its administrative interests outweigh the employee's interest in commenting on the matters at issue, or (2) the government would have reached the same adverse employment decision even in the absence of the plaintiff's exercise of free speech. *Eng*, 552 F.3d at 1070-71. Mere speculation that an employee's speech will cause conflict or disruption in the workplace is "insufficient to carry the day" as to whether administrative interests outweigh an employee's ability to speak on matters of public concern. *Moser v. Las Vegas Metro. Police Dept.*, 984 F.3d 900, 909 (9th Cir. 2021) [quoting *Nichols v. Dancer*, 657 F.3d 929, 935 (9th Cir. 2011)].

In this case, Mr. Clark can prove all three elements set forth in *Eng*, cited *supra*: First, Mr. Clark has spoken out on matters of public concern, particularly conduct he deems immoral based on what the Bible says. *Snyder*, 562 U.S. at 454. Second, Mr. Clark spoke outside his capacity as a government employee: "Statements are made in the speaker's capacity as citizen if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'" *Eng*, 552 F.3d at 1071 [quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n. 2 (9th Cir. 2008)]. Finally, Mr. Clark's speech is a substantial or motivating factor in adverse employment actions taken against him, namely SMS' and the District's threats of reassignment or dismissal in the event of a "substantial disruption" to the school environment at SMS. *See* Sale, *Re: Compl.*, pp. 6-7, and GPSD Ltr., pp. 1-3. Even if SMS' and the District's assertions concerning consequences for causing a substantial disruption could be construed as mere warnings rather than threats, those assertions demonstrate hostility toward Mr. Clark's religious beliefs and practices:

> "[T]he government, if it is to respect the Constitution's guarantee of free exercise [of religion], cannot impose regulations that are hostile to the beliefs of affected citizens and cannot act in a manner that ***passes judgment upon** or presupposes the illegitimacy of religious beliefs and practices*."

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1721-22 (2017) (emphasis added) [citing *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993)].

The District should note two things here: First, in *Obergefell v. Hodges* – the case that legalized same-sex marriage nationwide – U.S. Supreme Court Justice Anthony Kennedy recognized that "[m]any who deem same-sex marriage" and other advancements for LGBTQ+ persons "to be wrong reach that conclusion based on ***decent and honorable religious or philosophical premises***[.]" *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015) (emphasis added). Second, some – including the renowned magician Penn Jillette (of the famed duo Penn & Teller), an avowed atheist – consider warning non-believers about sin's potential consequences to be a loving act. *See* Penn Jillette, *A Gift of a Bible*, https://www.youtube.com/watch?v=6md638smQd8&t=209s (viewed March 5, 2021).

太平洋法律協會 chinese.pji.org | Instituto de Justicia Pacifico spanish.pji.org | 태평양 법률협회 korean.pji.org | Тихоокеанский Институт Правосудия russian.pji.org

Under the circumstances presented here, GPSD cannot show that it would have taken any adverse action against Mr. Clark in the absence of Mr. Clark's exercise of his free speech rights. The District and SMS must therefore show that their mutual interest in ensuring a safe environment for SMS' staff and students outweighs Mr. Clark's interest in sharing his Christian views – including those on LGBTQ+ issues – publicly. While some of Mr. Clark's colleagues, parents of SMS students, and students themselves may, at best, respectfully disagree with Mr. Clark's views and, at worst, find them abhorrent, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression." *Tinker*, 393 U.S. at 508; *see also Eagle Point*, 880 F.3d at 1106 [quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101 (1972)].

In addition, the Oregon Court of Appeals has declared that "[f]ree and open expression about sexual orientation is *clearly protected*" by Article I, § 8 of the Oregon Constitution, and such expression "'*may not be punished* in the interest of a uniform vision on how human sexuality should be regarded or portrayed.'" *Merrick*, 116 Or. App. at 264 (emphasis added) [quoting *State v. Henry*, 302 Or. 510, 525 (1987)]. This applies even, if not especially, in the context of educators who risk "be[ing] fired or subjected to other adverse 'personnel action' if they engage in such expression.'" *Id.* at 265.

### B. The District Cannot Cannot Restrict Mr. Clark's Speech Based on How Listeners – Including His Fellow Teachers – Might React.

"Where the lawfulness of speech turns on the reactions of others, the restriction is unconstitutional." *Sabelko v. City of Phoenix*, 846 F. Supp. 810, 822 (D. Ariz. 1994) [citing *Coates v. City of Cincinnati*, 402 U.S. 611, 611-14 (1971)].

In this case, both SMS and GPSD have threatened Mr. Clark with reassignment or dismissal based on others' reaction to his preaching. *See* GPSD Ltr., pp. 2-3 [Point 3, paragraph (b), and Point 4, paragraph 1 (concerning reassignment), and the next-to-last paragraph on the page (concerning "dismissal on a first offense")]. Such threats are an unconstitutional attempt to chill Mr. Clark's free speech rights for multiple reasons.

To begin with, the District defines "harassment" as "unwelcome conduct based on … sexual orientation," among other traits. *See* GPSD Ltr., p. 1 [Point 1, paragraph (a)]. The Oregon Supreme Court rejected this definition in declaring ORS 166.065(1)(a)(B), a provision of Oregon's criminal harassment statute, unconstitutionally overbroad:

> "Harassment [or the perception thereof] and annoyance are common reactions to seeing or hearing gestures or words that one finds unpleasant. Words or gestures that cause only that kind of reaction, however, cannot be prohibited in a free society, even if the words or gestures occur publicly and are insulting, abusive, or both. … '[A]mong the various historical crimes that are 'written in terms' directed at speech, those whose real focus is on some underlying harm or offense may survive the adoption of Article I, § 8 [of the Oregon Constitution], while *those that focus on protecting the hearer from the message do not*.'"

*State v. Johnson*, 345 Or. 190, 196-97 (2008) (emphasis added) [quoting *State v.*

太平洋法律協會 chinese.pji.org | Instituto de Justicia Pacifico spanish.pji.org | 태평양 법률협회 korean.pji.org | Тихоокеанский Институт Правосудия russian.pji.org

*Ciancanelli*, 339 Or. 282, 317 (2005)]. *Johnson*, the District should note, involved a truck driver who used sound-amplifying equipment to shout obscene and racist epithets at two women – one black, one white – whom he perceived to be lesbians. *Id.* at 192. Such conduct is far worse than anything Mr. Clark has ever done. Sale, *Re: Compl.*, pp. 6-7. In other words, the fact that some SMS teachers may deem Mr. Clark's preaching of the gospel "unwelcome conduct" is insufficient to constitute harassment – especially when his words are not necessarily aimed toward them personally. *See Tinker*, 393 U.S. at 509 ["In order for the State in person of a school to justify prohibition of a particular expression of opinion, it must be able to show that is action was caused by ***something more than the mere desire to avoid the discomfort and unpleasantness*** that always accompany an unpopular viewpoint" (emphasis added)].

The same principle applies to the District's assertions concerning speech that "would be ***perceived*** to make others be fearful or frightened" or Mr. Clark's association with groups "of people that may be ***perceived*** as harassing and intimidating." GPSD Ltr. at 2 (emphasis added) [Point 2, paragraphs (b) and (c)]. Even if Mr. Clark's preaching about sin and its consequences does make some listeners feel fearful or frightened, the U.S. Supreme Court has recognized that speech "may indeed best serve its high purpose when it ***induces a condition of unrest*** … as it presses for acceptance of an idea." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (emphasis added). The idea that sinners of all stripes must become aware of their status as sinners who need saving, in Mr. Clark's view, is precisely what induces sinners to repent and embrace faith in Christ – the reason why Christ came to earth in the first place (Matthew 9:13; Romans 3:23; John 3:18).

As unpopular as Mr. Clark's religious viewpoint might be (John 15:18), GPSD's repeated acknowledgments of Mr. Clark's constitutionally protected free speech rights mean nothing unless the District immediately ceases its efforts to chill Mr. Clark's attempts to reach the minds of willing listeners in a manner he deems true to biblical principles. *See Heffron v. Int'l Soc'y of Krishna Consciousness*, 452 U.S. 640, 655 (1981) [quoting *Kovacs v. Cooper*, 336 U.S. 77, 87 (1949)]. This is especially true given the District's insistence on giving Mr. Clark high-minded lectures about his duties as a teacher employed by GPSD, even though SMS has expressly absolved him of doing anything that violates SMS, GPSD, or ODE policy. Sale, *Re: Compl.*, pp. 6-7.

### C. Pursuant to Title VII, the District Has a Duty to Accommodate Mr. Clark's Religious Beliefs and Practices.

Title VII prohibits employers from discriminating against employees with respect to the employees' religion. 42 U.S.C. § 2000e-2. For purposes of Title VII, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year …" 42 U.S.C. § 2000e(b). Given that the term "person" includes governments, GPSD qualifies as an employer under Title VII. 42 U.S.C. § 2000e(a). The term "religion," meanwhile, "includes ***all*** aspects of religious observance and ***practice***, as well as ***belief*** …" 42 U.S.C. § 2000e(j) (emphasis added).

Under Title VII, employers must accommodate their employees' religious beliefs and practices where they can do so without undue hardship. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2031 (2015). Oregon law likewise requires "reasonable

太平洋法律協會 chinese.pji.org | Instituto de Justicia Pacífico spanish.pji.org | 태평양 법률협회 korean.pji.org | Тихоокеанский Институт Правосудия russian.pji.org

accommodation of an individual based on the health and safety needs of the individual," including the individual's mental and spiritual health. *See* ORS 659A.030(5). "Undue hardship means something greater than hardship." *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978). The fact that other employees might not like a co-worker's accommodation is not enough to establish undue hardship. *Id.*

In this case, because restricting Mr. Clark's evangelism activities would be (and already has been) damaging to Mr. Clark's mental and spiritual health, Mr. Clark requests that SMS and the District accommodate his beliefs by making no further attempts to restrict his off-hours evangelism activities. Controversial though Mr. Clark's religious beliefs and practices may be, GPSD would suffer no undue hardship in accommodating Mr. Clark's religion by letting him freely engage in evangelism activities during his non-working hours. The fact that at least two of Mr. Clark's colleagues at SMS would not be happy about the school or the District letting him engage in such activities is not adequate justification for refusing to accommodate Mr. Clark's religious beliefs. PJI thus strongly recommends that SMS and the District accommodate Mr. Clark's Christian faith pursuant to Title VII and ORS 659A.030(5) – doing otherwise would send a highly discriminatory message, that "Christians need not apply" to serve as teachers at SMS or any other school within the District.

## III.   Demand

"Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but because superiors [may] simply disagree with the content of the employees' speech." *Moser*, 984 F.3d at 909 [quoting *Rankin v. MacPherson*, 483 U.S. 378, 384 (1987)]. PJI thus respectfully takes this opportunity to remind GPSD of its commitment to providing a safe environment for all of its employees – including and especially Christian employees such as Mr. Clark.

Furthermore, based on the foregoing, PJI hereby demands that the District rescind, in writing, both its unlawful directives to Mr. Clark and its unlawful warnings of possible future adverse employment actions and provide a copy of the rescission to PJI at the e-mail address below. If the District does not provide written proof of rescission ***within 10 days*** of the date set forth at the top of this letter, PJI will have no alternative but to pursue legal action in federal court.

Thank you kindly for your time and attention to this matter.

Sincerely,

Ray D. Hacke
Staff Attorney
Pacific Justice Institute
P.O. Box 5229
Salem, OR 97304
E-mail: rhacke@pji.org

太平洋法律協會 chinese.pji.org | Instituto de Justicia Pacifico spanish.pji.org | 태평양 법률협회 korean.pji.org | Тихоокеанский Институт Правосудия russian.pji.org

CC: Barrett Sale
  Principal
  South Middle School
  350 West Harbeck
  Grants Pass, OR 97527
  E-mail: bsale@grantspass.k12.or.us

太平洋法律協會 chinese.pji.org | Instituto de Justicia Pacífico spanish.pji.org | 태평양 법률협회 korean.pji.org | Тихоокеанский Институт Правосудия russian.pji.org

# EXHIBIT "F"



May 6, 2021

**SUBMITTED VIA E-MAIL & REGULAR MAIL**
Kirk Kolb
Superintendent
Grants Pass School District
725 NE Dean Drive
Grants Pass, OR 97526
E-mail: kkolb@grantspass.k12.or.us

Barrett Sale
Principal
South Middle School
350 West Harbeck
Grants Pass, OR 97527
E-mail: bsale@grantspass.k12.or.us

> **Re: Notice of Tort Claim**
> **Claimant: Ryan D. Clark, 566 Bridge Lane, Wolf Creek, OR 97497**
> **Dates of Injuries: Feb. 26, 2021 and March 19, 2021**
> **Claimant's Attorney: Ray D. Hacke, Pacific Justice Institute**
> **P.O. Box 5229, Salem, OR 97304**

Dear Mr. Kolb and Mr. Sale:

The Pacific Justice Institute ("PJI"), a non-profit law firm whose mission includes assisting public employees facing religious discrimination and government encroachments on those employees' freedoms of speech, represents Ryan Douglas Clark ("Mr. Clark"), an employee of the Grants Pass School District ("GPSD" or the "District") who teaches at South Middle School ("SMS"). This letter's purpose is to inform you of Mr. Clark's intent to sue GPSD and certain of its officers, agents, and employees acting on behalf of the District – specifically, the two of you – for declaratory relief, injunctive relief, economic damages, non-economic damages, punitive damages, and any other relief that the court deems proper. Mr. Clark has already taken steps toward filing a complaint with Oregon's Bureau of Labor & Industries concerning your conduct. Mr. Clark's claims against GPSD arise from injuries that the two of you, while acting within the scope of your employment, knowingly and intentionally inflicted upon Mr. Clark concerning his efforts to exercise his constitutionally protected freedoms of speech, religion, and assembly during his non-working hours. Mr. Clark intends to file suit in federal court under 42 U.S.C. § 1983 and Title VII, with related state law claims under the Oregon Constitution [specifically, Article I, §§ 2, 3, 8, 20, and 26] and ORS 659A.030(1)(a) [Oregon's workplace discrimination law]. Mr. Clark's lawsuit will also include a claim for intentional infliction of emotional distress.

As you know, Mr. Clark is a devout Christian who spends much of his time outside of work preaching the gospel of Jesus Christ at various locations and events in the City of

Page 1 of 3

Grants Pass. Mr. Clark does this because his conscience compels him to help others find saving faith in Christ, as he has. To accomplish this, in Mr. Clark's view, it is necessary to tell others what they need saving from – i.e., the eternal consequences of sin. For individuals to feel convicted of having sinned against God so they may repent and seek salvation, Mr. Clark believes, it is necessary to tell people what constitutes sin. It is within this context that Mr. Clark feels compelled to publicly express his biblically-based views on matters of public concern, including issues of gender and sexuality.

Having taken offense to the religious views he has expressed publicly, some of Mr. Clark's colleagues at SMS have complained to the school's principal, Barret Sale ("Mr. Sale") – likely in the hopes of getting Mr. Clark fired. Mr. Sale and other GPSD officials have investigated Mr. Clark's conduct and ultimately absolved Mr. Clark of wrongdoing. The same can be said of Oregon's Teacher Standards and Practices Commission. Still, despite acknowledging that Mr. Clark's evangelism activities are protected under both the U.S. Constitution's First Amendment and the Oregon Constitution, both Mr. Sale and Kirk Kolb ("Mr. Kolb"), GPSD's superintendent, have attempted to restrict:

- **WHAT** Mr. Clark can say – for instance, he cannot tell his listeners, "'You'll burn in hell if you do/don't' (fill in the blank)," as the District has declared such statements "hateful" in violation of constitutional law;

- **HOW** he can say it – he cannot "invok[e] feelings of insecurity and fear," even when he is merely stating what the Bible says;

- **WHERE** he can say it – he is prohibited from attending youth gatherings within the District's boundaries, including youth-group meetings or Sunday school classes at his church and must refrain from posting "hateful" messages on social media sites;

- **WHOM** he can preach to – presumably the youth attending the aforementioned gatherings, parents or students within GPSD's boundaries, and GPSD staff; and

- **WHOM** he can associate with for expressive purposes – Mr. Clark faces consequences if he appears at events where GPSD students can see him standing with a group that may be perceived as hateful and harassing toward LGBTQ+ persons, regardless of whether that perception is accurate.

The District has threatened Mr. Clark with discipline – including "reassignment" and "dismissal on a first offense" – if he does not comply with the restrictions mentioned *supra*. Not only are the actions of Mr. Sale and Mr. Kolb, taken on GPSD's behalf, aimed at chilling the constitutionally protected freedoms of speech, religion, and assembly of a person of ordinary firmness, they have intentionally inflicted upon Mr. Clark the type of severe emotional distress that is intolerable in a civilized society.

Accordingly, PJI hereby demands that GPSD retain any documents relating to this matter, including but not limited to complaints, non-privileged communications between GPSD officials and/or Mr. Clark's teachers concerning Mr. Clark's conduct, and memoranda outlining any findings with respect to Mr. Clark's conduct.

太平洋法律協會 chinese.pji.org | Instituto de Justicia Pacifico spanish.pji.org | 태평양 법률협회 korean.pji.org | Тихоокеанский Институт Правосудия russian.pji.org

Please direct any correspondence concerning this notice of tort claim to the undersigned attorney at either the e-mail address or regular mail address listed below.

Sincerely,

Ray D. Hacke
Staff Attorney
Pacific Justice Institute
P.O. Box 5229
Salem, OR 97304
E-mail: rhacke@pji,org

太平洋法律協會 chinese.pji.org | Instituto de Justicia Pacifico spanish.pji.org | 태평양 법률협회 korean.pji.org | Тихоокеанский Институт Правосудия russian.pji.org

# EXHIBIT "G"

**U.S. Department of Justice**

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

June 08, 2021

Mr. Ryan Clark
c/o Ray D. Hacke, Esquire
Pacific Justice Institute
P.O. Box 5229
Salem, OR  97304

Re:  EEOC Charge Against Grants Pass School District 7
     No. 551202102405

Dear Mr. Clark:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC Seattle District Office, Seattle, WA.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                              Sincerely,


                              Kristen Clarke
                              Assistant Attorney General
                              Civil Rights Division


                         by      /s/ Karen L. Ferguson
                              Karen L. Ferguson
                              Supervisory Civil Rights Analyst
                              Employment Litigation Section


cc: Seattle District Office, EEOC
   Grants Pass School District 7